IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TRACI KING, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No.: 06-1015 |
| v. | ) | |
| | ) | |
| CITY OF NEW KENSINGTON, | ) | |
| FRANK LINK, and | ) | |
| CHARLES F. KORMAN | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

**CONTI, District Judge**

### I.    Introduction

Traci King ("plaintiff"), a female police officer, initiated this gender-based discrimination action against her employer, the City of New Kensington ("New Kensington") and former police chiefs, Frank Link ("Link") and Charles F. Korman ("Korman," together with New Kensington and Link, collectively "defendants").

Plaintiff asserts claims for (1) gender-based discriminatory actions and hostile work environment which violated her Fourteenth Amendment right to equal protection pursuant to 42 U.S.C. § 1983 ("Section 1983") (count one), (2) gender-based discriminatory actions, retaliation, and hostile work environment which violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII") (count two), and (3) gender-based discriminatory actions and hostile work environment which violated her right to equal protection as provided by article

1

1, section 28 of the Constitution of the Commonwealth of Pennsylvania, PA. CONST. art. I, § 28 ("PERA"[1]) (count three).

After considering defendants' motion for summary judgment (Docket No. 34), plaintiff's response, the joint statement of material facts ("J.S.") (Docket No. 48), and the parties' other submissions, the court will grant defendants' motion for summary judgment with respect to plaintiff's claims of gender-based discrimination under Title VII, Section 1983, and the PERA. Defendants' motion for summary judgment will be denied in all other respects.

## II.    Factual Background

### A.    Introductory facts

New Kensington employed twenty-two full-time police officers.  (J.S. ¶ 146.)  In September 1992, plaintiff began her employment as a New Kensington police officer.  (J.S. ¶ 1.) Plaintiff claims on the day in 1992 when she went to pick up an employment application, Korman told her that New Kensington would never hire another woman police officer, because they already had one.  (J.S. ¶ 145.)  She continued to work for New Kensington and did not seek employment elsewhere.  (J.S. ¶ 2.)  There have never been more than two women officers in the New Kensington police department.  (J.S. ¶ 147.)  The other woman officer,  Marcie Humphrey ("Humphrey"), is senior to plaintiff in the New Kensington police department.  (J.S. ¶ 151.) Humphrey also complained about being treated differently than male officers and of being passed over for promotions.  (J.S. ¶ 152.)

---

[1]PERA is an acronym for the Pennsylvania Equal Rights Amendment which is set forth in article 1, section 28 of the Pennsylvanian Constitution.

Since 2002, Link served as mayor of New Kensington. (J.S. ¶ 11.) Link served as police chief for three and one-half years in the 1990s. (Pl.'s Ex. I at 362a; J.S. ¶ 12.) Thomas Seefeld ("Seefeld") was the police chief for approximately four years after Link. (J.S. ¶ 16.) Seefeld preceded Korman as chief of police. (Id.) Plaintiff and Seefeld did not get along. (J.S. ¶ 17.) Plaintiff testified that most of the instances involving a denial of her request for training occurred during Seefeld's tenure as police. (Pl.'s Ex. B at 59a; Pl.'s Ex. E at 170a.)

Korman started as a New Kensington police officer in 1982. (J.S. ¶ 18.) Korman was plaintiff's street sergeant in or around 1999, 2000 and 2001; the two had a good relationship at this point in time. (J.S. ¶ 19.) In November 2001, Korman became the acting chief. (J.S. ¶ 20.) On January 8, 2002, he was appointed the chief of police. (Id.) Korman and Link discussed departmental issues on an as needed basis. (J.S. ¶ 27.) Link was rarely present in the police station. (Pl.'s Ex. B at 71a; Pl.'s Ex. J at 401a; J.S. ¶ 15.) Link testified that the amount of times Korman brought problems to Link's attention while Link was the mayor was minimal. (Pl.'s Ex. I at 357a.)

Plaintiff recalled being denied training by Korman in late 2005 (November or December) for a session that dealt with general investigations. (Pl.'s Ex. B at 49a-52a, 52b, 52c.) Korman and plaintiff's relationship was good until she became pregnant in late 2005. (J.S. ¶ 21.) Plaintiff disagreed with Korman's interpretation of seniority rights. (J.S. ¶ 23.) Plaintiff believed she tried to file a grievance on the seniority rights issue in 2002, but the grievance disappeared and was filed on behalf of another officer the following year. (J.S. ¶ 24.) Plaintiff filed grievances against her employer. (Def.'s Ex. B at 220; J.S. ¶ 5.) Other police department personnel feared retaliation at the hands of Korman. (Pl.'s Ex. F at 257a; J.S. ¶ 6.)

**B.**     **Plaintiff's pregnancy-related complaints and requests for light duty**

Plaintiff testified that in 2003, Korman, in responding to a hypothetical about what would happen should she become pregnant, stated that plaintiff would be fired.  (J.S. ¶ 43.) Plaintiff also testified that Korman made the same comment in 2005 - she would be fired if she became pregnant.  (J.S. ¶ 45.)  Plaintiff stated that Korman said, "I'm not the one that got you pregnant" during a discussion in 2005.  (J.S. ¶ 47.)

On December 24, 2005, plaintiff learned that she was pregnant.  (J.S. ¶ 49.)  Plaintiff requested light duty for five months because New Kensington is dangerous and she "didn't feel it was safe for [her] to be there on the road."  (J.S. ¶¶ 50, 51.)  Under the collective bargaining agreement, light duty was provided for any non-work related disability.  (Pl.'s Ex. F at 248a-50a.)  Ronald Zellers ("Zellers"), who was a detective lieutenant and point man for the officers' union, was unaware of any limitation on the duration of light duty under the collective bargaining agreement for a non-work related disability.  (Id.; Def's Ex. CC at 31.)  Zellers was aware, however, that Korman instituted a one-month light duty policy when Korman became the police chief.  (Pl.'s Ex. F at 252a.)  Korman denied plaintiff's five-month request and limited plaintiff's light assignment to one month.  (J.S. ¶ 52.)  Korman, in addition to limiting the length of plaintiff's light duty, transferred her to a different shift without notice during her period of light duty.  (J.S. ¶ 53.)  Plaintiff filed a grievance with respect to Korman changing her shift without notice.  (Id.)  This grievance was eventually resolved.  (Id.)

Plaintiff filed a second grievance based upon her request "to remain working in a light duty status for the period of her pregnancy or until she takes maternity leave."  (J.S. ¶ 54.) Plaintiff sent a memorandum dated January 9, 2006 to Link and Korman.  (Pl.'s Ex. K at 457a.) The memorandum documents plaintiff's notification of Korman about her pregnancy and her

query into the options for leave (including the possibilities of using a leave of absence, sick leave, and leave as mandated by the Family Medical Leave Act, 29 U.S.C. §§ 2601 *et seq.* ("FMLA")). (Pl.'s Ex. K at 457a.) In response to plaintiff's memorandum dated January 9, 2006, Korman decided that plaintiff would receive one month of light duty. (J.S. ¶¶ 59, 199.) With respect to being unable to obtain a longer period of light duty, plaintiff said to Korman, "then do what you said, fire me, I guess"; Korman replied, "ok." (J.S. ¶ 58.) Plaintiff returned to full duty on or around February 2, 2006, after having a miscarriage. (J.S. ¶ 60.)

With respect to the implementation of that policy, Korman explained that there were several reasons for it:

> One is light duty in our department is only make [sic] work for lack of a better term. There is no real light duty assignment. They can't work the desk because that's a union job. Basically all they do is sit at the station and if someone walks in and wants to make a report that's what they do. They can't have contact with prisoners. They can't be out in the public. It's very limited in its use. It's not beneficial to the city to have them come back. In addition to that, they earn 30 sick days a year of which they can save 120. So in any one calendar year they can have 150 sick days [I]n addition to their vacation and everything else, I just think it's an excessive amount of time anything above one month.

(J.S. ¶ 39.) Plaintiff believed that no other officer "has been in need of light duty" for more than one month for a non-work related condition since Korman became chief, except for Sergeant Jim Klein ("Klein"). (J.S. ¶ 40.) During Korman's tenure as chief, Klein was the first officer, in 2003, to request more than one-month light duty for a non-work related condition. (J.S. ¶ 41.)

In February or March 2006, plaintiff again became pregnant. (J.S. ¶ 61.) On or about May 15, 2006, plaintiff notified Korman that she was pregnant, but "[t]o avoid disciplinary action she would 'attempt' to work full duty." (J.S. ¶ 62.) Plaintiff provided medical information which led to her receipt of one-month light duty (twenty-four days). (J.S. ¶ 65.)

After giving birth to her son on November 23, 2006, plaintiff went to her mother's house in Lower Burrell, Pennsylvania to pump milk during her meal break. (J.S. ¶ 207.) Plaintiff discussed the matter with the sergeant on her shift, Sergeant Olearchich ("Olearchich") and he was aware of plaintiff going to her mother's house during her meal break. (Pl.'s Ex. C at 83a, 86a.) Korman sent a memorandum to plaintiff informing her that she was not permitted to leave New Kensington while on duty. (Pl.'s Ex. C at 84a; J.S. ¶ 208.) Arrangements were made for plaintiff to use the kitchen in the municipal building. (Pl.'s Ex. C at 84a.) Plaintiff was uncomfortable with using the kitchen and only used it for two nights. (Pl.'s Ex. C at 84a-85a.) She testified that she was uncomfortable and nervous in the kitchen because it was located near the front doors and there was constant incoming and outgoing traffic. (Id.) Korman allowed Klein and Officer LaPorte ("LaPorte") to leave New Kensington to have their meals at home, since those two officers' properties were in close proximity to New Kensington. (J.S. ¶ 209; Def.'s Ex. DD at 109-10.)

### C.    Tampering with plaintiff's mailbox and voice mail

King experienced problems with people in the squad room tampering with her mailbox. (J.S. ¶ 173.) The mailbox tampering included having ketchup and mustard squirted into her mailbox, having pregnancy test, AIDS and gonorrhea pamphlets left in her mailbox, and having Mr. Yuk and Starkist Tuna stickers placed on her mailbox. On several occasions sexually offensive graffiti was written on King's mailbox, including the words "cunt," "pussy patrol" and "bitch."[2] (J.S. ¶ 178.) Once in 2003 when King asked Korman what he was going to do about the mailbox situation, he answered, "Nothing." (J.S. ¶ 180.)

---

[2]Defendants claim that these incidents happened long in the past. Plaintiff disagrees and claims they have been ongoing and most recently happened during Korman's tenure. (J.S. ¶ 179.) For purposes of this motion for summary judgment, the court will view the disputed facts in plaintiff's favor.

In August 2005, plaintiff's paycheck was taken from her mailbox. (J.S. ¶ 68.) After the alleged taking of plaintiff's paycheck from her mailbox, Korman issued a memorandum on August 10, 2005, to all the officers informing them that the officers must obtain their paychecks directly from the chief. (J.S. ¶ 70.) Plaintiff's paycheck resurfaced after a few months and she requested the approval of fingerprint analysis on the envelope that contained the paycheck from Korman. (Pl.'s Ex. C at 94a-95a; J.S. ¶ 69.) Korman did not allow the analysis. (Pl.'s Ex. C at 94a.) After the August 10, 2005 memorandum, there were no further incidents involving plaintiff's paycheck. (J.S. ¶ 71.) In the summer of 2006, Korman applied for a federal grant to replace the current camera system and to add a camera to the squad room. (J.S. ¶ 73.)

On May 11, 2007, plaintiff sent a memorandum to Korman that included allegations that on April 24, 2007 "someone [had] put a roll of duct tape and stood a bullet upright in [her] mailbox." (J.S. ¶ 74.) Plaintiff also stated in the same memorandum that the same thing had occurred on May 2, 2007. (Id.) Korman issued a warning memorandum dated May 11, 2007, to all the officers in the department. (J.S. ¶ 75.) Korman also issued a memorandum to plaintiff, requesting that she provide additional information and advising her to "notify [her] supervisor immediately and then notify [him]" if another incident occurred. (J.S. ¶ 76.) In response to both incidents, plaintiff removed the items from her mailbox and placed them on the counter where she puts everything. (J.S. ¶ 80.) Plaintiff considered the bullets and the duct tape to be a personal threat. (Def.'s Ex. B at 161; J.S. ¶ 82.)

Plaintiff did not recall if she spoke to anyone about the May 2, 2007 incident, but she reported the incident to Korman in a written memorandum. (J.S. ¶ 81.) Plaintiff also found a box of shotgun shells (after May 2, 2007) which she placed in her car. (J.S. ¶ 85.) On August 4, 2007, a cut out photo of knee pads from a magazine were left in plaintiff's mailbox. (J.S. ¶ 86.)

Plaintiff informed Korman about the incident by memorandum the following day. (Id.) Korman testified that he believed that the cut out photo of the knee pads "implicates a sexual harassment policy." (Pl.'s Ex. H at 331a.)

On August 2 or 3, 2007, plaintiff found "the classified ads inside" her mailbox. (J.S. ¶ 89.) Plaintiff did not retain the classified ads, but she reported the incident to Korman in the August 5, 2007 memorandum. (J.S. ¶ 90; Pl.'s Ex. K at 452a.) On one occasion, within three years of September 2007, plaintiff asked Korman to have "someone who's familiar with computers to come in to find out what date and time" a document was typed. (J.S. ¶ 91.) This was in regard to an item that had been left in her mailbox. (Id.) Plaintiff did not recall the context of the message, except that it would have been a rude or ignorant phrase or sentence that had been previously taped to her mailbox. (J.S. ¶ 92.)

When plaintiff sought help from Korman with respect to the mailbox tampering, Korman responded that she was "always causing him problems." (J.S. ¶ 93.) She did not recall which incident Korman was responding to when he made the statement that plaintiff was always causing him problems. (J.S. ¶ 94.) No one was ever disciplined for tampering with King's mailbox. (J.S. ¶ 188.)

Plaintiff's voice mail was tampered with in or around 2004. (J.S. ¶ 189.) Korman was informed about the tampering with plaintiff's voice mail and that she could not access her messages. (Def.'s Ex. DD at 68-69.) Korman listened to the voice mail and identified the voice to be that of LaPorte. (Def.'s Ex. DD at 70.) Korman called LaPorte in and he admitted to tampering with plaintiff's voice mail. (Id.) Due to his diabetes, LaPorte went on sick leave; he was permitted to be on paid administrative leave during the period in which he was waiting to

obtain a medical opinion stating that it was safe for him to return to work. (Def.'s Ex. DD at 92; Pl.'s Ex. H at 336a; J.S. ¶ 203.)

### D. The July 26, 2005 incident

On July 26, 2005, plaintiff was the officer in charge ("OIC"), a position the senior officer assumes during a shift (if the sergeant is unavailable). (Def.'s Ex. B at 178; Pl.'s Ex. C at 106a.) Plaintiff and Officer Grillo ("Grillo") responded to a domestic call in the district to which Officer DiGiacobbe ("DiGiacobbe") was assigned. (Def.'s Ex. B at 178-79; Def.'s Ex. D at 128-29; Pl.'s Ex. C at 106a-07a.) DiGiacobbe arrived on the scene and plaintiff tried to fill DiGiacobbe in about the call. (Def.'s Ex. B at 179; Pl.'s Ex C at 106a-107a.) DiGiacobbe became loud and rude, stating he would get the information himself. (Def.'s Ex. B at 179; Pl.'s Ex. C at 107a.) DiGiacobbe tried to order plaintiff off the call and stated to plaintiff that he would not take orders from "some bitch". (Def.'s Ex. B at 180; Pl.'s Ex. C at 108a.) Plaintiff informed Korman about the incident, but she could not recall his response. (J.S. ¶ 101.) She informed Korman that DiGiacobbe would possibly retaliate for the July 26, 2005 incident by not providing her back-up. (Pl.'s Ex. A at 41a-42a.) Plaintiff spoke to Korman a month or two after their discussion about the confrontation with DiGiacobbe to confirm that she had not received back-up from DiGiacobbe. (Pl.'s Ex. A at 41a-42a.)

DiGiacobbe also complained to Korman because (according to DiGiacobbe), King "responded to a call in his district without notifying anyone," was "confrontational" with DiGiacobbe after he arrived and "called him little man and said you're nothing." (J.S. ¶ 102.) Korman "told Officer DiGiacobbe that he was wrong for confronting her in public, if there is an issue[,] that she's the OIC and he should address it with her and if he still felt the response

9

wasn't appropriate then he should bring it to [Korman], that he shouldn't confront her again."
(J.S. ¶ 104.)

### E.    Vehicle and miscellaneous complaints

Plaintiff and Humphrey, the other woman officer, were usually assigned to the oldest and worst patrol vehicle.  (J.S. ¶ 153.)  The seats in plaintiff's vehicle "get worn out" and were damaged.  (J.S. ¶ 112.)  The seats become worn primarily because plaintiff shares her police vehicle with Humphrey and Gary Shubert ("Shubert").  (Def.'s Ex. B at 150-51; Pl.'s Ex. B at 76a.)  The police vehicles were assigned to multiple shifts.  (Def.'s Ex. EE at 153-56.)  Plaintiff testified that the "[t]he padding is smashed," which "causes pain" because she experiences problems in her hip and has had "muscular problems from years of bad vehicles."  (J.S. ¶ 113.) Plaintiff stated that when the seats are new, they "cause[ ] slightly less pain."  (J.S. ¶ 114.)  The vehicles are replaced every three to four years.  (Def.'s Ex. D at 156-57.)

The New Kensington sexual harassment policy does not permit sexually explicit magazines in the workplace.  (J.S. ¶ 170.)  Despite this policy, it is not unusual for sexually explicit magazines to be found in the station and for the male officers to watch sexually explicit movies inside the station.  (J.S. ¶ 171.)

Plaintiff was aware that Officers Deringer and Netzlof made sexually derogatory remarks about her.  (J.S. ¶ 29.)  Plaintiff's husband, Keith King ("K. King") also recalled hearing those officers saying sexually derogatory things about plaintiff in a restaurant.  (J.S. ¶ 135.)  The words uttered by those officers were purported to be "whore," "slut," and something related to "STDs."  (Def.'s Ex. B at 194-96; Pl.'s Ex. K at 453a.)  Plaintiff confronted Officer Netzlof in the squad room about the reported incident, but did not speak with Officer Derringer.  (J.S. ¶ 30.) On January 13, 2003, Plaintiff complained to Korman about the incident.  (Pl.'s Ex. K at 453a.)

### F.       Back-up allegations

Plaintiff claims that she does not receive appropriate back-up or work related information from male officers in the department.  (J.S. ¶ 192.)  She told her husband K. King about her experiences with the police department even before they were married.  (J.S. ¶ 157.)  K. King was employed as a police officer for Lower Burrell, Pennsylvania since 2000.  (J.S. ¶ 124.)  He always worked the 11 to 7 shift (also known as the "midnight shift").  (Id.)  Lower Burrell has a mutual aid agreement with New Kensington and "it's not uncommon for officers to back each other up depending on the nature of the call."  (J.S. ¶ 125.)

 K. King observed his wife, plaintiff, not receiving back-up.  (Pl.'s Ex. G at 266a-69a.) The last call that K. King remembered related to inadequate back-up for plaintiff was a domestic incident on Bridge Street where both plaintiff and he responded, but no other officers arrived; this incident occurred in or around October 2007 (K. King testified this incident may possibly had occurred a month before his deposition on November 30, 2007).  (Def.'s Ex. FF at 18; J.S. ¶ 129.)

K. King was friends with Officer Writt and remembers complaining to him, prior to his marriage to plaintiff, about the lack of provision of back-up for plaintiff.  (J.S. ¶ 132.)  Plaintiff testified that she complained to Korman about the lack of back-up.  (Pl.'s Ex. A at 41a-42a.) There are two instances that plaintiff recalled talking specifically with Korman about the lack of back-up involving the July 2005 confrontation with DiGiacobbe.  (Pl.'s Ex. A at 44a-45a.)

### G.       Sexual harassment policy and training

New Kensington had a sexual harassment policy contained in its summary guide (the "summary guide"). (Def.'s Ex. D at 50-52; J.S. ¶ 162.) The New Kensington police department does not have its own sexual harassment policy. (Pl.'s Ex. H at 312a.) The Allegheny Valley Lodge No. 39 of the Fraternal Order of Police ("FOP") is the police officers' union which financially supports the New Kensington Wage and Police Committee, the bargaining unit for the police officers. (Def.'s Ex. DD at 48-49; J.S. ¶ 163.) The FOP took the position, contrary to New Kensington's position, that the summary guide (including the sexual harassment policy) did not apply to the police because it was implemented without the input of the police. (J.S. ¶¶ 140, 164, 167.) Plaintiff was not sure whether New Kensington's sexual harassment policy applied to the police department. (J.S. ¶ 139.) The FOP's position regarding the summary guide was consistent over time and known to Link and Korman. (J.S. ¶ 165.)

Neither Korman nor Link took any steps to inform officers that the police are covered by New Kensington's sexual harassment policy or that it applies to them. (Pl.'s Ex. H at 311a; J.S. ¶ 166.) They did not instruct the police officers regarding the equal employment opportunity ("EEO") procedures described in the summary guide. (J.S. ¶ 168.) Korman testified that he was not aware if police officers were required to attend training on sexual harassment matters nor was he aware of any written training materials that were distributed to the officers. (Def.'s Ex. DD at 44; Pl.'s Ex. H at 307a.)

### H.     Stipulations

The parties stipulated that counts one (Section 1983 claims) and three (PERA claims) are subject to a two-year statute of limitations. (Docket No. 31, ¶¶ 5-7.) With respect to those counts, plaintiff cannot seek relief for matters or events that occurred prior to July 31, 2004. (Id.)

Plaintiff cannot obtain relief under count two (Title VII claims) for matters or events that occurred prior to April 18, 2004. (Docket No. 31 ¶ 8.)


## III. Procedural History

On April 17, 2006, plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). (J.S. ¶ 141.) The EEOC charge of discrimination was dual filed with the Pennsylvania Human Relations Commission.[3] (Stipulations made by both parties, Docket No. 31, ¶ 1.) Plaintiff filed the EEOC charge because she "had enough," was pregnant, and felt that she was not the only person being hurt by New Kensington. (J.S. ¶ 143.) The EEOC issued a right to sue letter on January 18, 2007. (Docket No. 31, ¶ 3.) Plaintiff timely commenced this lawsuit.


## IV. Standard of Review

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the nonmoving party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter,

---

[3] Plaintiff filed the charge of discrimination with the Pennsylvania Human Relations Commission, but did not raise any claims under the Pennsylvania Human Relations Act, 43 PA. CONST. STAT. ANN. §§ 951 *et seq.* ("PHRA") in this case.

but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. Id. at 249. The court is to draw all reasonable inferences in favor of the nonmoving party. El v. Southeastern Pa. Transp. Auth., 479 F.3d 232, 238 (3d Cir. 2007) ("In considering the evidence, the court should draw all reasonable inferences against the moving party"). The United States Court of Appeals for the Third Circuit has stated:

> [I]f there is a chance that a reasonable factfinder would not accept a moving party's necessary propositions of fact, pre-trial judgment cannot be granted. Specious objections will not, of course, defeat a motion for summary judgment, but real questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof, will.

Id. The court may consider any material or evidence that would be admissible or usable at trial in deciding the merits of a motion for summary judgment. Horta v. Sullivan, 4 F.3d 2, 8 (1st Cir. 1993) (citing 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2721, at 40 (2d ed. 1983)); Pollack v. City of Newark, 147 F. Supp. 35, 39 (D.N.J. 1956), aff'd, 248 F.2d 543 (3d Cir. 1957) ("in considering a motion for summary judgment, the court is entitled to consider exhibits and other papers that have been identified by affidavit or otherwise made admissible in evidence").


**V.     Discussion**

    **A.     Gender-Based Discrimination Claims**

        **1.     Title VII**

            **a.     Burden-Shifting Framework**

The Supreme Court recognized that it is often difficult for a plaintiff to prove that an employer acted with conscious intent to discriminate. See McDonnell Douglas Corp. v. Green,

411 U.S. 792 (1973). One manner in which a plaintiff can meet this ultimate burden of persuasion is by demonstrating that an employer's stated reason for the challenged action is not the true reason, but rather was a pretext for unlawful discrimination. Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981). In cases where there is no direct evidence of discrimination, the United States Court of Appeals for the Third Circuit applies the burden-shifting analysis set forth in McDonnell Douglas. See Barber v. CSX Distrib. Servs., 68 F.3d 694 (3d Cir. 1995). Under this analysis, a plaintiff must first establish a prima facie case of discrimination. Burdine, 450 U.S. at 254; McDonnell Douglas, 411 U.S. at 802.

If the plaintiff successfully demonstrates a prima facie case of discrimination, the burden of production – but not the burden of persuasion – shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment decision. Simpson v. Kay Jewelers Div. of Sterling, Inc., 142 F.3d 639, 644 n.5 (3d Cir. 1998). The defendant can satisfy this burden by offering evidence of a nondiscriminatory reason for its action. Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994). Once the defendant offers a legitimate, nondiscriminatory reason for the challenged conduct, the plaintiff has the ultimate burden of proving by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were pretext for discrimination. Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410 (3d Cir. 1999). The McDonnell Douglas burden-shifting analysis is applied to cases under Title VII. See McDonnell Douglas, 411 U.S. at 801-806.

### b.      Prima Facie Case

Title VII was enacted to prohibit employers from discriminating against employees on several bases, including sex, with respect to compensation, terms, conditions, or privileges of employment. Burdine, 450 U.S. at 259. Title VII was amended in 1978 by the Pregnancy

Discrimination Act, which provides:

> The terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work . . . .

42 U.S.C. § 2000e(k) (the "Pregnancy Discrimination Act"). Employment discrimination occurs when an employee's sex or pregnancy is a motivating factor in an employer's adverse employment decision. In re Carnegie Ctr. Assocs., 129 F.3d 290, 294 (3d Cir. 1997) (citing 42 U.S.C. § 2000e-2(m)). A claim under the Pregnancy Discrimination Act is analyzed under the usual Title VII discrimination claim framework. Urbano v. Continental Airlines, Inc., 138 F.3d 204, 206 (5th Cir. 1998).

To state a claim for discrimination under Title VII, a plaintiff must show by a preponderance of the evidence that: (1) she was a member of the protected class; (2) she was qualified for the position; (3) an adverse employment action was taken by the employer; and (4) the employer more favorably treated others similarly situated. Scheidemantle v. Slippery Rock Univ., 470 F.3d 535, 539 (3d Cir. 2006). The burden of making this prima facie case is light. Burdine, 450 U.S. at 253.

The parties do not dispute that the first two elements are met here: (1) plaintiff was a member of the protected class, since she is a woman and was pregnant, and (2) she worked as a police officer since 1992 and was objectively qualified to be treated equally as the male officers. Defendants do not contest her credentials. The parties dispute whether plaintiff established elements three and element four.

### (i.) Element Three - Adverse Employment Actions

In responding to defendants' summary judgment motion, plaintiff asserts that a number of adverse employment actions were taken against her. Plaintiff asserts that she was discriminated against by defendants because she was assigned to light duty for only a month, even though she requested to be assigned to light duty for the duration of her pregnancy. She alleges that a number of males had been assigned to light duty for over a month for non-work related injuries. In addition, plaintiff asserts that defendants coupled her light duty assignment with an undesirable shift change, and a similar change was not made for men who went on light duty assignment. Plaintiff asserts that during her pregnancies and after giving birth to her son, she was limited to unpaid leave as mandated by the FMLA. She argues males were permitted extended leave, occasionally with pay. Plaintiff asserts that she was denied a day off in 2005 when her husband was released from a hospital after surgery, whereas males were given time off to care for their ailing spouses. She also asserts that she was not picked up by male officers, she was assigned to pick up the other female officer, male officers did not recognize her authority, she was assigned the worst patrol vehicles, and she did not receive appropriate back-up by male officers.

The United States Court of Appeals for the Third Circuit has defined "an adverse employment action" under Title VII as "an action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." Storey v. Burns Int'l Sec. Servs., 390 F.3d 760, 764 (3d Cir. 2004) (citing Cardenas v. Massey, 269 F.3d 251, 263 (3d Cir. 2001). "[An] adverse employment action must be one that produces a material employment disadvantage." Higgins v. Gonzales, 481 F.3d 578, 584 (8th Cir. 2007) (quoting Kerns v. Capital Graphics, Inc., 178 F.3d 1011, 1016-17 (8th Cir. 1999)). Modest changes in duties or working conditions, "even unpalatable or unwelcome ones," that do not

produce a material disadvantage are not adverse actions, <u>Higgins</u>, 481 F.3d at 584; nor are actions that simply make an employee unhappy. <u>Robinson v. City of Pittsburgh</u>, 120 F.3d 1286, 1300 (3d Cir. 1997). Examples of adverse employment actions include termination, cuts in pay or benefits, circumstances amounting to constructive discharge, or changes that affect future career prospects. <u>Higgins</u>, 481 F.3d at 584 (citing <u>Kerns v. Capital Graphics, Inc.</u>, 178 F.3d 1011, 1016-17 (8th Cir. 1999)). Adverse employment actions may also include demotions, transfers to less desirable positions, and unsatisfactory job evaluations. <u>Clowes v. Allegheny Valley Hosp.</u>, 991 F.2d 1159, 1161 (3d Cir. 1993) (citing <u>Shealy v. Winston</u>, 929 F.2d 1009 (4th Cir. 1991); <u>Buckley v. Hosp. Corp. of Am.</u>, 758 F.2d 1525, 1530-31 (11th Cir. 1985); <u>Junior v. Texaco, Inc.</u>, 688 F.2d 377, 380 (5th Cir. 1982); <u>Meyer v. Brown & Root Constr. Co.</u>, 661 F.2d 369 (5th Cir.1981); <u>Muller v. U.S. Steel Corp.</u>, 509 F.2d 923 (10th Cir. 1975)).

Although there is evidence that some of the actions taken against plaintiff were unwelcome, there is no evidence that several of the asserted adverse actions produced a material employment disadvantage. Plaintiff did not offer evidence that she suffered a disadvantage based upon who she picks up or who picks her up. Although plaintiff was denied a day off in 2005, she suffered no material disadvantage, because she ignored the denial and took the day off and was not disciplined for doing so. <u>Hart v. Life Care Center of Plano</u>, 243 F. App'x 816, 818 (5th Cir. 2007) (denial of one day off does not rise to the level of an adverse employment action); <u>Gary v. Washington Metro. Area Transit Auth.</u>, 886 F. Supp. 78, 90 (D.D.C. 1995) (denial of request for day off that upset employee and forced her to take sick leave was not adverse employment action). A change in shift, even though a possible inconvenience, does not

in and of itself amount to a material disadvantage.[4]  Additionally, that other employees did not

recognize plaintiff's authority was not an adverse employment action.  Mazur v. Wal-Mart

Stores, Inc., 250 F. App'x 120, 125 (6th Cir. 2007) (ostracism by co-workers does not amount of

adverse employment action) (internal citations omitted).

In contrast, plaintiff being given the worst police vehicles might be an adverse

employment action, since it might limit her ability to perform her job and prevent her from

advancing in her law enforcement career.  Plaintiff not receiving back-up might also be

considered an adverse employment action, because it could also limit her ability to perform her

job responsibilities in certain situations and makes her job more dangerous.[4]  Being denied paid

leave is arguably an adverse action taken by her employer, since that action amounts to a cut in

pay and benefits.  While plaintiff argues that not being assigned to light duty for over a month is

an adverse action, as the job tasks for that position are significantly and materially different, it is

hard to view that position as one that is better than a full duty job.  There is no evidence that her

---

[4] A shift change does not in and of itself amount to a material disadvantage.  See Jones v. Dist. of Columbia Dept. of Corr., 429 F.3d 276, 281 (D.C. Cir. 2005); DiBrino v. Dept. of Veterans' Affairs, 118 F. App'x 533, 535 (2d Cir. 2004).  If there had been a reduction in pay or an effect on career prospects, the change might arguably rise to the level of a material disadvantage and an alteration of the terms, conditions, and privileges of employment.  In Mondzelewski v. Pathmark Stores, Inc., 162 F.2d 778, 787 (3d Cir. 1998), the Court of Appeals for the Third Circuit held that a shift change altered the terms, conditions, and privileges of employment, because there was evidence that several employees regarded the new shift was one of the "punishment shifts."  Although plaintiff adduced evidence that Korman was known to be vindicative (Pl.'s Ex. D at 136a-37a), plaintiff did not adduce evidence that the new shift could be viewed as punishment or a demotion, because there is no evidence that the new shift was objectively inferior.  Plaintiff only offered that the shift was inconvenient for her personally because of her particular circumstances (her husband also works the midnight shift and she wanted to be free during daytime hours to sell her home, build a new home, and prepare for her baby).  (Pl.'s Ex. K at 455a.)  See Williams v. R.H. Donnelley, Corp., 368 F.3d 123, 128 (2d Cir. 2004) (denial of plaintiff's request to be transferred positions was not adverse employment action, even though plaintiff subjectively desired a position in a different city where she maintained a home); Grube v. Lau Indus., Inc., 257 F.3d 723, 728 (7th Cir. 2001) (change in work hours from first to second shift was not adverse employment action, even though the change burdened plaintiff's family responsibilities).

[4] Lack of back-up by fellow law enforcement officials has been held to be non-adverse.  Duncan v. Manager, Dept. of Safety, City and County of Denver, 397 F.3d 1300, 1314 (10th Cir. 2005); Matthews v. City of Gulfport, 72 F. Supp. 2d 1328, 1338 (M.D. Fla. 1999).  A district court within the Third Circuit, however, has held otherwise.  Clarkson v. Pennsylvania State Police, No. 99-783, 2000 WL 1513773, at *6 (E.D. Pa. Oct. 10, 2000).  This court will consider lack of back-up as an adverse employment action, because plaintiff might not be able to perform certain tasks without assistance and because of the dangers it may pose.

ability to perform her job or advance her career would be enhanced if she had light duty work. For purposes of this analysis, however, the failure to be assigned light duty for more than one month will be considered an adverse employment action.

### (ii.)   Element Four - Treatment of Similarly Situated Individuals

With respect to each of the asserted adverse employment actions, plaintiff must also offer evidence that similarly situated male employees were treated more favorably in order to establish a prima facie case. Although there is testimony that could support the argument that the back-up plaintiff received was lacking and there are broad assertions that plaintiff was the only officer who did not receive proper back-up (Pl.'s Ex. G at 265a-71a), there is no evidence on the record of the type of back-up male officers received. Although plaintiff argues she was assigned the worst patrol vehicles, those vehicles were also used by males. Plaintiff testified at her deposition that Shubert, a male officer, used the same vehicles as plaintiff. In addition, those vehicles were used by multiple shifts. Male officers would have therefore been subjected to using the same vehicles.

Plaintiff argues that one of the male police officers, LaPorte, was permitted to take administrative leave and was not required to pay back the time or money he received while on leave, but she was not permitted to take administrative leave and was forced to take unpaid sick leave. LaPorte, however, was not similarly situated to plaintiff. LaPorte had to use sick leave, just as plaintiff did, for part of his time off. He was only on administrative leave during the period in which he had a medical opinion to show he was physically incapable of returning to work. Plaintiff obtained a medical opinion that she should be placed on light duty while pregnant, but offered no medical opinion about whether she was physically able to return to

work during that time period.

Plaintiff did not adduce sufficient evidence that male employees were treated more favorably than her with respect to light duty assignment. When Korman began his tenure as chief, he issued a thirty-day limit on light duty. Consistent with this policy, Korman only allowed plaintiff to be assigned to light duty for thirty days, despite her request for five months due to pregnancy. There was no admissible evidence that Korman permitted males to be assigned to light duty for longer than thirty days. Plaintiff pointed to her deposition testimony that Klein told her he was off for more than thirty days. Plaintiff also pointed to the deposition testimony of Zellers, who recalled Klein telling him that Korman said he could have light duty for more than thirty days.[5] Hearsay statements not capable of being admitted at trial, however, cannot be considered on a motion for summary judgment. Philbin v. Trans Union Corp., 101 F.3d 957, 961 (3d Cir. 1996). Here, Klein's alleged statement to plaintiff is hearsay, and Zellers' statement is double hearsay. Plaintiff did not argue the statements are admissible under any exception to the hearsay rule. Although Korman and Klein are available to testify, and thus the statements could hypothetically be offered in admissible forms at trial, there is no suggestion that such testimony would be offered by them. There was no evidence adduced that Klein had more than thirty days of light duty. The statements that Korman allegedly made to Klein and that Klein allegedly made to Zellers could come in at trial as prior inconsistent statements for impeachment purposes, see FED. R. EVID. 613, but they cannot come in for substantive purposes unless the declarants made the statements at "a trial, hearing, or other proceeding, or in a

---

[5] Zellers also testified at his deposition that Craig Harnish was assigned to light duty for more than thirty days. (Pl.'s Ex. F at 250a.) This incident, however, occurred before Korman became police chief, and Korman's policy was not implemented at the time Craig Harnish was assigned to light duty. (Id. at 250a-51a.) Because Craig Harnish was not assigned under Korman's policy, Craig Harnish was not similarly situated to plaintiff. See Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992) ("to be deemed 'similarly-situated,' the individuals must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct....").

deposition." FED. R. EVID. 801(d)(1)(A). There is no evidence that Korman or Klein made the statements in one of these situations. Although Korman's statement to Klein is admissible hearsay to the extent it is an admission of Korman, who is a party, FED. R. EVID. 801(d)(2), Zellers could not testify at trial about what Klein told him (including what Klein told him about what Korman said).

Plaintiff did not offer evidence to establish that Klein's statement is an admission of the defendants, because she did not show that Klein "was authorized to make a statement concerning the alleged [adverse employment action], or that this subject was a matter within the scope of [his] employment." Thomas v. Atmos Energy Corp., 223 F. App'x 369, 374 (5th Cir. 2007) (affirming the grant of summary judgment for a Title VII discrimination claim and affirming the strike of a double hearsay statement, because the statement of a co-worker regarding what a boss said was not an admission). The deposition statements are not admissible at trial for substantive purposes and cannot be used to support plaintiff's case at the summary judgment stage. Santos v. Murdock, 243 F.3d 681, 684 (2d Cir. 2001). Because the deposition statements cannot be considered for purposes of this motion for summary judgment, there is insufficient evidence that any male employees were treated more favorably than plaintiff with respect to light duty assignment.

Plaintiff cannot establish a prima facie case of employment discrimination because of her sex or because of her pregnancies. For each asserted adverse employment action, no reasonable jury could find that if it did qualify as an adverse employment action, members not of the protected classes were more favorably treated. Summary judgment must be granted in defendants' favor with respect to her claims of discrimination under Title VII.

22

Even though plaintiff did not establish a prima facie case relating to her being limited to thirty days of light duty, plaintiff argues in her brief that she has adduced sufficient evidence that the defendants' alleged legitimate business reason for the limiting her light duty assignment is pretextual. The court will analyze that gender discrimination claim under the rest of the McDonnell Douglas burden-shifting test to address this argument raised by plaintiff.

### c.      Defendants' Business Reason

Once a plaintiff has established a prima facie case the burden shifts to the defendants to rebut the presumption of discrimination by producing evidence that the adverse employment actions against the plaintiff were taken for reasons that are legitimate and nondiscriminatory. Burdine, 450 U.S. at 254. An employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a reason that was not discriminatory for the adverse employment decision. Fuentes, 32 F.3d at 736; see generally St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993). It is not necessary for the defendants to persuade the court that they were actually motivated by the reason which they offer. Burdine, 450 U.S. at 254; Bd. of Trs. of Keene State Coll. v. Sweeney, 439 U.S. 24, 25 (1978).

Defendants offered that the reason for limiting plaintiff's light duty assignment to one month was Korman's institution of a policy limiting light duty assignment for all employees, regardless of sex or the circumstances necessitating the assignment, to thirty days. Korman determined that the light duty assignment had little utility to the police department, and thus he wanted to limit the use of it. Under that policy, Korman's limiting plaintiff's light duty assignment to thirty days would not be based upon her being female or pregnant.

Recognizing that the burden on defendants is light, and defendants can satisfy this burden "by introducing evidence which, taken as true, would permit the conclusion that there was a non-

discriminatory reason for the unfavorable employment decision," <u>Fuentes</u>, 32 F.3d at 763, the court is satisfied that defendants set forth a legitimate, nondiscriminatory reason for the adverse employment actions taken against plaintiff.

### d.      Pretext

The last part of the analysis requires that, "[o]nce the employer answers its relatively light burden by articulating a legitimate reason for the unfavorable employment decision, the burden of production rebounds to the plaintiff, who must now show by a preponderance of the evidence that the employer's explanation is pretextual (thus meeting the plaintiff's burden of persuasion)." <u>Fuentes</u>, 32 F.3d at 763.  Once the employer has stated a legitimate, non-discriminatory reason for the adverse employment action, the plaintiff in order to survive summary judgment must satisfy at least one of the two prongs articulated by the United States Court of Appeals for the Third Circuit in <u>Fuentes</u>:

> [T]he plaintiff must point to some evidence, direct or circumstantial, from which the fact-finder could reasonably either (1) disbelieve the employers articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.

<u>Id.</u> at 764.

### (i.)      Prong One

A plaintiff must submit evidence that could cause a reasonable fact-finder to discredit the employer's articulated reason for the adverse employment action in order to overcome summary judgment and bring her case to trial.  To discredit the employer's articulated reason, the plaintiff does not need to produce evidence that necessarily leads to the conclusion that the employer acted for discriminatory reasons, <u>Sempier v. Johnson & Higgins</u>, 45 F.3d 724, 728 (3d Cir.

1995), nor produce additional evidence beyond her prima facie case. <u>Fuentes</u>, 32 F.3d at 764. A plaintiff must, however, demonstrate such:

> weaknesses, implausibilities, inconsistencies, incoherencies [sic], or contradictions in the employer's proffered legitimate reasons [such] that a reasonable factfinder could rationally find them "unworthy of credence" and hence infer that the proffered nondiscriminatory reason "did not actually motivate" the employer's action. [<u>Fuentes</u>, 32 F.3d] at 764-65 (quoting <u>Ezold v. Wolf, Block, Schorr, and Solis-Cohen</u>, 983 F.2d 509, 531 (3d Cir. 1992))**.**

<u>Simpson</u>, 142 F.3d at 644.

The question asked in prong one of the <u>Fuentes</u> test is not whether the employer made the best, or even a sound, business decision; it is whether the real reason for the adverse result suffered by the plaintiff is discrimination. <u>Keller v. Orix Credit Alliance</u>, 130 F.3d 1101, 1109 (3d Cir. 1997). The court is neither permitted to get involved in the subjective business decisions of the employer, nor set its own standards for the employer, unless there is evidence of discrimination. <u>Ezold</u>, 983 F.2d at 527. "An employment decision that would create a problem under prong one will likely turn on whether the stated reason for [adverse employment action] is so implausible that a fact-finder could not believe it to [be] worthy of credence." <u>Orenge v. Veneman</u>, No. 04-297, 2006 WL 2711651, at *15 (W.D. Pa. Sept. 20, 2006); <u>see</u> <u>Menta v. Cmty. Coll. of Beaver County</u>, 428 F. Supp. 2d. 365, 374 (W.D. Pa. 2006). An example of a stated reason that a fact-finder could find implausible and beyond belief was set forth in <u>Brewer v. Quaker State Oil Ref. Corp.</u>, 72 F.3d 326 (3d Cir. 1995). The employer stated that reason for terminating the employee was because his sales performance was deficient, but the evidence on the record demonstrated that the terminated employee was the leading salesperson in the region. <u>Id.</u> at 330-32.

In the instant case, plaintiff did not offer evidence that addresses defendants' legitimate business reason. Plaintiff argues that Korman's policy is not reflected in the collective bargaining agreement or in any written standard operating procedure, as Zellers' deposition testimony arguably established. Plaintiff argues that a reasonable jury could infer that, because the policy was not in writing, Korman fabricated the policy when she first made her request for light duty. A reasonable jury, however, could not draw that inference because Zellers' deposition testimony demonstrated that Korman issued the thirty-day maximum light duty policy when he came in as chief in 2002, and not when plaintiff requested light duty in 2006. There is no admissible evidence on the record that Korman only applied this policy to plaintiff and not to male officers. Zellers' deposition statement that suggests Korman would permit a male to serve on light duty for more than a month is double hearsay and inadmissible for purposes of this summary judgment motion, for the reasons already set forth in this opinion. Plaintiff's deposition hearsay statement is also inadmissible. Under these circumstances, no reasonable finder of fact could conclude that plaintiff provided sufficient evidence of discriminatory pretext by defendants under the first prong of Fuentes.

### (ii.) Prong Two

The court must next examine the second prong of the Fuentes framework to determine if plaintiff presented sufficient evidence of pretext. To show that discrimination was more likely than not a cause for the employer's adverse actions, a plaintiff must point to evidence with sufficient probative force that would allow a fact-finder to conclude by a preponderance of the evidence that the protected characteristic was a motivating or determinative factor in the employment decision. Simpson, 142 F.3d at 644-45. Relevant evidence that could be relied on in the evaluation of this prong includes: (1) whether the employer has previously discriminated

against the plaintiff, (2) whether the employer has discriminated against other people within the plaintiff's protected class or within another protected class, or (3) whether the employer has treated more favorably similarly situated persons not within the protected class. Id. at 645.

### (a) Evidence of previous discrimination against plaintiff

Plaintiff argues that the behavior of Korman is evidence of a repeated pattern of harassing, discriminatory acts. Plaintiff only points, however, to Korman's threats of firing her if she became pregnant as evidence of pretext. In 2003, Korman, in response to a hypothetical question, said plaintiff would be fired if she became pregnant. Korman made a similar statement in 2005.

With respect to remarks made by upper management employees being evidence of past discrimination against a plaintiff, the United States Court of Appeals for the Third Circuit has recognized three factors to be considered in determining whether a stray remark is probative of discrimination: (1) the relationship of the speaker to the employee and within the corporate hierarchy; (2) the temporal proximity of the statement to the adverse employment decision; and (3) the purpose and content of the statement. Ryder v. Westinghouse Elec. Corp., 128 F.3d 128, 133 (3d Cir. 1997); see Keller, 130 F.3d at 1112. These factors must be considered in toto in light of the nature and context in which the comment was made. See Keller, 130 F.3d at 1112-13.

No decisions of the court of appeals were found holding that stray remarks, standing alone, could reasonably be viewed as sufficient to establish pretext under the second prong of the Fuentes test. Instead, there must be substantial supporting evidence other than the isolated remarks to support the denial of summary judgment. Agogbua v. Abington Mem'l Hosp., No. 03-6897, 2005 WL 1353612, at *7 (E.D. Pa. May 21, 2005).

In Ezold, a female attorney sued a large Philadelphia law firm that denied her partnership status. Prior to the partnership decision, a senior management official made several remarks that were alleged to have been sufficient evidence of gender-based discrimination. The first remark was made during Ezold's selection process to become an associate at the firm, five years prior to the firm's decision not to grant Ezold partnership status.[6] The court of appeals determined that the first remark was insufficient because it was not temporally proximate to the employment decision at issue, stating that it was "too remote and isolated to show independently that unlawful discrimination rather than [the firm's] asserted reason, more likely caused the firm to deny Ezold the partnership she sought in 1988." Ezold, 983 F.2d at 545. Ezold also pointed to six other alleged sexist remarks made by her immediate supervisor, who was the head of the litigation section in which she was an associate, over her five-year period of employment in an attempt to demonstrate a discriminatory atmosphere existed at the firm.[7] Ezold argued that these comments, taken as a whole, were sufficient for the court to hold that her employer's reason for denying her partnership status was a pretext for sexual discrimination. The court of appeals rejected Ezold's argument, and concluded that the comments were not "sufficient in and of themselves to sustain the district court's judgment in favor of Ezold." Id. at 546-47.

---

[6] The district court found the following fact to be true:

> During the selection process . . . Mr. Kurland told Mr. Ezold that it would not be easy for her at Wolf, Block because she did not fit the Wolf, Block mold since she was a woman, had not attended an Ivy League law school, and had not been on law review.

Ezold, 983 F.2d at 545.

[7] Plaintiff alleged that the head of the litigation section (1) singled her out at a litigation department dinner to discuss the issue of sexual harassment at the firm; (2) routinely gave her instructions to "smile" in the hallway ; (3) crudely asked her if she had any romantic encounters the previous night; (4) recounted a judge's comments regarding a murder case involving the rape of a corpse at a litigation associates' breakfast; (5) told Ezold not to refer another talented female attorney to the firm because "he did not want the problems caused by another female attorney working in the litigation department"; (6) cautioned female attorneys with children from traveling on business. Ezold, 983 F.2d at 546. The district court did not make a finding that these statements were actually made, but the court of appeals considered the evidence in the light most favorable to Ezold. Id.

In this case, Korman was plaintiff's direct supervisor when the comments were made. On the other hand, Korman's 2003 comment is not temporally proximate with the decision in 2006 to deny plaintiff light duty assignment of over one month. There is also no evidence that Korman's 2005 remark is temporally proximate to that decision, since the date of the remark is not specified. Plaintiff learned of her pregnancy on December 24, 2005, and she requested five months of light duty some time after that date. The remark could have occurred on any date during the 2005 year. In Keller, the court of appeals indicated that the remark in that case was not temporally proximate when it had been made four or five months prior to the adverse employment action. Keller, 130 F.3d at 1112. Despite the purpose of the comments being arguably to discourage plaintiff from getting pregnant, the remarks do not directly relate to the relevant employment decision. They relate to termination, and not light duty assignment.

More importantly, plaintiff does not argue any other evidence, besides these comments, supports a finding that defendants' stated reason is pretextual. Korman's comments may be relevant, but the comments, in and of themselves, lack sufficient probative force for finding discrimination.

### (b) Whether the employer has discriminated against other people within plaintiff's protected class

On the record before the court, plaintiff did not adduce sufficient evidence that defendant discriminated against other pregnant females, or other females in general. The only evidence that plaintiff provided is that the other female police officer, Humphrey, complained she was not promoted because she was female. These allegations are vague; plaintiff did not state when she talked with Humphrey about these matters and did not describe the complaints in detail. Also, there is no information to establish that Humphrey was objectively qualified for the positions or

29

that those who were promoted were less qualified. As such, plaintiff's allegations of discrimination against others within the protected class are not sufficiently established. Based upon the undisputed evidence of record, viewing all disputed facts in favor of plaintiff, and drawing all reasonable inferences in favor of plaintiff, the court concludes that a reasonable jury could not find in favor of plaintiff with respect to this factor.

### (c) Whether the employer has treated more favorably similarly situated persons not within the protected class

Plaintiff contends that despite Korman's policy, he granted Klein, who was a male officer, an assignment to light duty of more than one month. Plaintiff failed to point to evidence of record that would be admissible at trial to support this contention, as already explained. Her allegations fail to give rise to an inference that defendants' given reason was pretextual and no reasonable jury could find in her favor with respect to this factor.

When considering all three factors of the second prong of the Fuentes test in this case, the only relevant evidence to consider are the comments made by Korman. Stray remarks alone lack sufficient probative force to allow a fact-finder to conclude that a legitimate business reason offered by an employer is pretextual. The second prong cannot be met.

In summary, plaintiff did not adduce sufficient evidence with respect to her discrimination claim to show defendants' stated reason for her termination was pretextual under either prong of the Fuentes test. Summary judgment must be granted in favor of defendants.

### 2.     Section 1983

Plaintiff makes claims of a gender-based discrimination pursuant to Section 1983 (based upon a violation of the Fourteenth Amendment Equal Protection Clause), in addition to those

claims asserted pursuant to Title VII.  Under Section 1983 to establish a claim relating to a denial of equal protection a plaintiff must make a showing of intentional discrimination. Andrews v. City of Philadelphia, 895 F.2d 1469, 1478 (3d Cir. 1990).  Plaintiff must demonstrate that she was treated differently from those that are similarly situated to her.  Id.

The Court of Appeals for the Third Circuit has recognized that a plaintiff can bring claims under Title VII and the Equal Protection Clause; provided that the claims operate from the same set of facts.  Pollock v. City of Philadelphia, No. 06-4089, 2008 WL 3457043, at *9 (E.D. Pa. Aug. 8, 2008) (citing Bradley v. Pittsburgh Bd. of Educ., 913 F.2d 1064, 1079 (3d Cir. 1990)).  The Court of Appeals for the Third Circuit has recognized that claims under Title VII and Section 1983 have the same underlying elements.  See Stewart v. Rutgers, The State Univ., 120 F.3d 426, 432 (3d Cir. 1997); Graham v. Avella Area Sch. Dist., No. 05-1344, 2008 WL 203359, at *6 (W.D. Pa. Jan. 24, 2008) (addressing hostile work environment claim brought pursuant to Section 1983); see also St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993) (assuming Title VII burden-shifting framework applies to a claim brought under Section 1983). The same standards are utilized to assess plaintiff's gender discrimination claims.  Id.

The analysis with respect to gender discrimination under Title VII set forth above is dispositive of plaintiff's gender-based discrimination claim under Section 1983.  Plaintiff did not adduce sufficient evidence of a prima facie case of gender discrimination.  Even if a prima facie case had been made, plaintiff did not adduce sufficient evidence that defendants' legitimate business reason was pretextual.  Summary judgment must be granted in defendants' favor with respect to plaintiff's gender based-discrimination claim under Section 1983, for the same reasons summary judgment must be granted in favor of defendants with respect to her Title VII gender-based discrimination claim.

### B. Hostile Work Environment Claims

#### 1. Title VII[8]

The hostile work environment claim had its genesis in <u>Meritor Sav. Bank, FSB v. Vinson</u>, 477 U.S. 57 (1986), in which the United States Supreme Court recognized that sexual harassment was actionable under Title VII. In that case, the Court indicated that two types of sexual harassment claims existed under Title VII: (1) a claim based upon a *quid pro quo* arrangement; and (2) a claim based upon an intimidating, hostile, or offensive work environment. <u>Id.</u> at 66.

A *quid pro quo* claim requires the plaintiff to prove that a tangible employment action resulted from the hostile work environment, such as when adverse employment action is taken after the plaintiff refuses to submit to sexual demands. If the plaintiff can prove this link between a tangible action and the work environment, then the plaintiff establishes that the terms and conditions of employment have changed. <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742, 754 (1998). There are no allegations of a *quid pro quo* arrangement in this case.

The latter claim, more commonly known as "hostile work environment" claim, was refined in the wake of <u>Meritor</u> to cover other types of discrimination claims as well. <u>See</u> <u>Faragher v. Boca Raton</u>, 524 U.S. 775, 786-87 (1998). An actionable claim of a hostile work environment requires the plaintiff to demonstrate "by the totality of the circumstances, the

---

[8]Defendants raise several arguments in support of summary judgment on plaintiff's hostile work environment claim. Defendants argue that plaintiff's allegations refer to events that occurred prior to the actionable time period and should not be considered. Defendants assert that plaintiff did not show that they fostered a hostile work environment by intentionally discriminating against her based on her sex. Defendants further contend that plaintiff did not establish that the alleged acts that fall within the actionable time period are severe or pervasive. Plaintiff argues that there has been a continuing violation by defendants that allows her to anchor those alleged discriminatory acts that occurred before the filing period to the discriminatory conduct that occurred during the actionable time period. The parties stipulated to the applicable period for which relief could be sought for each claim. The concept of continuing violations is not implicated under those circumstances. The relevant evidence proffered by plaintiff about incidents predating the relevant statute of limitations period, however, may still be considered by the court with respect to background and intent.

existence of a hostile or abusive working <u>environment</u> which is severe enough to affect the psychological stability of [an] . . . employee." <u>Andrews v. City of Phila.</u>, 895 F.2d 1469, 1482 (3d Cir. 1990) (emphasis in original). To be ultimately successful on a claim of hostile work environment, the plaintiff must demonstrate that the harassment was severe or pervasive to such a degree that the harassment altered the terms and conditions of employment. <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742, 752 (1998).

The following five elements must be established by a plaintiff bringing a hostile work environment claim pursuant to Title VII: (1) the plaintiff suffered intentional discrimination because of her membership in a protected class; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex or race in that position; and (5) there is a basis for vicarious liability. <u>See</u> <u>Andrews</u>, 895 F.2d at 1482; <u>see also</u> <u>Cardenas v. Massey</u>, 269 F.3d 251 (3d Cir. 2001); <u>Aman v. Cort Furniture</u>, 85 F.3d 1074, 1081 (3d Cir. 1996); <u>West v. Phila. Elec. Co.</u>, 45 F.3d 744, 753-54 (3d Cir. 1995). In situations where the defendant did not take tangible employment action against plaintiff, the defendant may raise an affirmative defense by showing: (1) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (2) that the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer. <u>Id.</u> at 765.

The determination whether a plaintiff is able to establish each of the elements of a hostile work environment claim is a fact-intensive inquiry into the "overall scenario" in which the alleged harassment occurred. <u>See</u> <u>Cardenas</u>, 269 F.3d at 261. "The Supreme Court has cautioned that 'conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or

abusive – is beyond Title VII's purview.'" Newring v. PNC Corp., No. 01-1973, 2006 WL 840347, at *7-8 (W.D. Pa. Mar. 29, 2006) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, (1993), citing Meritor Sav. Bank v. Vinson, 477 U.S. at 67)). In determining whether an environment is hostile or abusive, the court must evaluate relevant factors including "the frequency of the conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23. Each element of a hostile work environment claim will be considered.

### a. Intentional discrimination because of membership in a protected class

Plaintiff presented sufficient evidence for a reasonable fact-finder to infer that she suffered intentional discrimination because of her membership in a protected class. As a woman, plaintiff is a member of a protected class. The evidence showed tampering with her mailbox by her co-workers in the form of sexually offensive graffiti which included derogatory terms usually used towards females and in 2007 a picture of knee pads. A pregnancy test was left in her mailbox that was obviously directed to her because she was female, and sexually explicit comments were made about her because she was female. From the nature of the allegations a fact-finder could infer that they were done intentionally and because plaintiff was a woman. See Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 n.3 (3d Cir. 1990)("The intent to discriminate on the basis of sex in cases involving sexual propositions, innuendo, pornographic materials, or sexual derogatory language is implicit, and thus should be recognized as a matter of course.").

34

**b. The discrimination was pervasive or severe**

Plaintiff presented evidence of ongoing and varied incidents which taken as a whole could be considered pervasive and severe. Her male co-workers are unwilling to follow her directions or provide her with backup. Her co-workers tampered with her mailbox, i.e. left threatening and incendiary materials in her mailbox. Her male co-workers uttered sexually derogatory statements about her and the same co-workers disparaged her by calling her a "slut" or a "whore" and insinuated she had unsavory reputation with references to sexually transmitted diseases. Korman told her in 2005 she would be fired if she became pregnant. As recently as 2007, these incidents - which were made known to her supervisor - happened with sufficient frequency, even after Korman learned about them, that a reasonable fact-finder could conclude that their cumulative effect was pervasive and severe. Id. at1486 (in vacating the trial judge's decision finding no liability on the Title VII hostile work environment claim, the court instructed the trial judge to look at the totality of the circumstances and noted "[t]he evidence in this case includes not only name calling, pornography, displaying sexual objects on desks, but also the recurrent disappearance of plaintiffs' case files and work product, anonymous phone calls, and destruction of other property").

**c. The discrimination detrimentally affected the plaintiff**

A reasonable fact-finder could infer that the discrimination detrimentally affected plaintiff. Plaintiff was affected by the behavior to the extent that she began keeping a notebook documenting the incidents as they came up. King wrote numerous memos to Korman complaining of her treatment and filed various grievances with the union. King also testified to physical and mental distress related to her treatment.

**d. The discrimination would detrimentally affect a reasonable person of the same sex in that position**

A reasonable fact-finder could conclude that a reasonable woman in the same position as King would have been detrimentally affected by the discriminatory treatment. There is no indication that plaintiff was overly sensitive to the offensive conduct of her co-workers or supervisor. The type and degree of offensive and threatening language directed towards plaintiff would be offensive to any similarly situated woman. See Andrews, 895 F.2d at 1486 ("[T]he trial judge should look at all of the incidents to see if they produce a work environment hostile and offensive to women of reasonable sensibilities.").

**e. There is a basis for vicarious liability**

Korman, the chief of police, was well aware of the discriminatory conduct directed toward plaintiff and even participated in some himself. No one was ever disciplined for discriminatory behavior or required to undergo sexual harassment training. Additionally, neither Link nor Korman cleared up the discrepancy about whether New Kensington's sexual harassment policy applied to the New Kensington police department. Korman acknowledged that one of the incidents (involving the cut out photo of the knee pads) implicated a sexual harassment policy. The police officers did not undergo EEO training under New Kensington's sexual harassment policy. The police officers were not trained regarding the EEO procedures described in the summary guide. Korman testified that he was not aware whether police officers were ever required to attend training on sexual harassment matters nor was he aware of any written training materials that were distributed to the officers.

Viewing these allegations in a light most favorable to plaintiff, the court finds that a reasonable jury could conclude, from the evidence adduced by plaintiff, that defendants'

discriminatory acts constituted a hostile work environment.

### f. Affirmative defense

With respect to Title VII retaliation claims, plaintiff did not adduce evidence that defendants committed a tangible employment action. Defendants could raise an affirmative defense. Defendants, however, did not do so in this case. Even if the defense was raised, the evidence would not support that defense. Defendants did not inform employees of a sexual harassment policy and the employees were not provided with any sexual harassment training or materials. Under these circumstances, summary judgment can not be granted in favor of defendant with respect to plaintiff's Title VII hostile work environment claim.

### 2.    Section 1983

Similar to gender-based discrimination claims, hostile work environment claims under the Equal Protection Clause follow the same framework established for Title VII hostile work environment claims. Pollock v. City of Philadelphia, No. 06-4089, 2008 WL 3457043, at *8 n.2 (E.D. Pa. Aug. 8, 2008) (citing McPhaul v. Bd. of Comm'rs of Madison County, 226 F.2d 558, 567 (7th Cir. 2000)). The same analysis for the Title VII hostile work environment claims described above will apply to plaintiff's Section 1983 hostile work environment claims. For the reasons discussed with respect to the Title VII claims, plaintiff adduced sufficient evidence for a reasonable fact-finder to conclude that defendants violated plaintiff's Fourteenth Amendment rights in fostering a hostile work environment. Under these circumstances, summary judgment can not be granted in favor of defendant with respect to plaintiff's section 1983 hostile work environment claim.

## C.    Retaliation Claims

The anti-retaliation provision of Title VII provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).  Retaliation claims brought under Title VII follow the framework established in McDonnell Douglas.[9]  See Jalil v. Avdel Corp., 873 F.2d 701, 706 (3d Cir. 1989). Under the first step in this framework, a plaintiff has the initial burden of establishing the following prima facie case: (1) the plaintiff engaged in protected activity; (2) the plaintiff's employer took adverse action after or contemporaneous with the employee's protected activity; and (3) a causal link exists between the employee's protected activity and the employer's adverse action.  Abramson v. Wm. Patterson College of N.J., 260 F.3d 265, 286 (3d Cir. 2001).

### 1.    Protected Activity

The anti-retaliation provision of Title VII is comprised of two separate clauses: the opposition clause, and the participation clause.  Slagle v. County of Clarion, 435 F.3d 262, 266 (3d Cir. 2005).  The opposition clause requires, at the very least, an informal protest of discriminatory employment practices.  Barber v. CSX Dist. Servs., 68 F.3d 694, 701-02 (3d Cir. 1995) (citing Summer v. United States Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990)).  The protest, in whatever medium, cannot be a general complaint of unfair treatment; the protest must specifically oppose a practice that is made unlawful by employment discrimination laws.

---

[9] The briefing on the retaliatory Title VII claims was sparse and not analytically developed.  The analysis with respect to this claim reflects the parties' undeveloped arguments.  It also appears that plaintiff's retaliation claims are only raised under Title VII.  (Compl. ¶ 63.)

Barber, 68 F.3d at 701.  The participation clause, on the other hand, prohibits "retaliation because the employee 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII.]'"  Robinson v. Southeastern Pa. Transp. Auth., 982 F.2d 892, 896 n.4 (3d Cir. 1993) (quoting Holden v. Owens-Illinois, Inc., 793 F.2d 745, 748-53 (6th Cir. 1986)).  The participation clause affords broader protection than the opposition clause.  Slagle, 435 F.3d at 266.

This case implicates the participation clause due to plaintiff filing her charge of discrimination with the EEOC on April 17, 2006.  Plaintiff also raised a general argument that filing grievances and making complaints to her superiors about the behavior of her co-workers were protected activities, and she claims she was retaliated against for these activities.  These alleged protected activities fall under the opposition clause.  Under the opposition clause, the complaints and grievances cannot be general complaints of unfair treatment.  In this situation, plaintiff's grievances and complaints are not general protests of unfair treatment; plaintiff specifically identified the actions and practices she alleges are discriminatory, and she also identified the individuals – when known – who committed those acts.  See Curay-Cramer v. Ursuline Acad. of Wilmington, Delaware, Inc., 450 F.3d 130, 135 (3d Cir. 2006) (a protected opposition activity to an unlawful employment practice or action must explicitly or implicitly identify the employer and the practice).  Plaintiff therefore satisfied the first element of the prima facie case with respect to her retaliation claims.

### 2.      Adverse Action

In 2006, the Supreme Court in Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 67-68 (2006), clarified what is required to pursue a retaliation claim for a protected activity, illuminating in particular what is required to meet the second element of the prima facie case -

proof that an employer took an "adverse employment action" against the plaintiff.  The Court

explained that in order to state a retaliation claim, a plaintiff must show that a "reasonable

employee would have found the challenged action materially adverse, which in this context

means it well might have dissuaded a reasonable worker from making or supporting a charge of

discrimination."  Id. at 68 (internal quotation omitted).  A plaintiff may meet her burden by

demonstrating that her employer's conduct is "likely to deter victims of discrimination from

complaining to the EEOC."  Id. (internal quotation and citation omitted).  The Court carefully

distinguished "material adversity" from "trivial harms" and further reiterated that Title VII does

not set forth an American workplace civility code.  Id.  "[P]etty slights, minor annoyances, and

simple lack of good manners" are normally not sufficient to deter a reasonable person.  Id.

The Court clarified that the material adversity of an action should be determined by an

objective standard.  Id. ("We refer to reactions of a *reasonable* employee because we believe that

the provision's standard for judging harm must be objective.") (emphasis in original).  The Court

further indicated that determining whether an action is materially adverse requires a fact

intensive inquiry and an analysis of the totality of the circumstances.  The appropriate analysis

inquires into what would be an objective person's reaction based upon a particular set of factual

circumstances:

> We phrase the standard in general terms because the significance
> of any given act of retaliation will often depend upon the particular
> circumstances.  Context matters.  "The real social impact of
> workplace behavior often depends on a constellation of
> surrounding circumstances, expectations, and relationships which
> are not fully captured by a simple recitation of the words used or
> the physical acts performed."

Id. (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81-82 (1998)).

Plaintiff believes Korman changed her shift as retaliation for her involvement in

40

protected activities. Plaintiff, accustomed to working the midnight shift, was switched in 2006 by Korman to the 3 to 11 shift. As earlier explained, plaintiff did not subjectively desire the change, because her husband also worked the midnight shift. (Pl.'s Ex. K at 455a.) The standard is objective, however, and plaintiff has not offered evidence that the midnight shift is objectively more desirable than the 3 to 11 shift. The shift change is therefore not an adverse employment action.

Plaintiff has also made general allegations that the hostile treatment by her co-workers, including tampering with her mailbox, tampering with her voice mail, failing to provide her back-up etc., increased after she made complaints to her supervisor. The United States Court of Appeal for the Third Circuit has recognized that a retaliation claim predicated upon a hostile work environment is cognizable under the anti-retaliation provision of Title VII, and a showing of a hostile work environment can satisfy the adverse action requirement. Jensen v. Potter, 435 F.3d 444, 449 (3d Cir. 2006) ("We thus hold that both [the discrimination and retaliation] provisions [of Title VII] can be offended by harassment that is severe or pervasive enough to create a hostile work environment."). Because this court previously concluded that a reasonable jury could find a hostile work environment from the totality of the circumstances in this case, plaintiff satisfied the second prong of her prima facie claim of retaliation.

### 3. Causal Connection

With respect to the existence of a causal link between the employee's protected activity and the employer's adverse action, two main factors are relevant: (1) timing and/or (2) evidence of ongoing antagonism. Abramson v. Wm. Patterson Coll. of N.J., 260 F.3d 265, 288 (3d Cir. 2001) ("Temporal proximity . . . is sufficient to establish the causal link. [A] plaintiff can [also] establish a link between his or her protected behavior and subsequent discharge if the employer

engaged in a pattern of antagonism in the intervening period.").

In the first prong, there must be a close temporal proximity between the protected activity and the adverse employment action.  Id.  While the court of appeals has not enumerated a stringent formula for what is considered to be too long of a gap between the protected activity and adverse action, the courts have held that a time span of several months is too great.  See Williams v. Phila. Hous. Auth., 380 F.3d 751, 760 (3d Cir. 2004) (two months too long to permit an inference of causation); George v. Genuine Parts Co., No. 04-108, 2007 U.S. Dist. LEXIS 5373, at *34-35 (W.D. Pa. Jan. 25, 2007) (holding that though suggestiveness is highly sensitive to the facts of each case, that a three-month gap "is not so close as to be unusually suggestive of retaliatory motive, especially where an obvious and unimpeached non-retaliatory motive exists.").

The United States Court of Appeals for the Third Circuit has been somewhat ambivalent with respect to whether timing alone is sufficient to satisfy the causation prong of the prima facie case.  See Woodson v. Scott Paper Co., 109 F.3d 913, 920-21 (3d Cir. 1997) ("Temporal proximity is sufficient to establish the causal link."); Jalil, 873 F.2d at 708 (causal link established where plaintiff discharged two days following employer's receipt of the plaintiff's EEOC claim); but cf. Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997) (causation prong not established on timing alone where 19 months passed following protected activity and adverse employment action: "Even if timing alone could ever be sufficient to establish a causal link, we believe that the timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred."); Quiroga v. Hasbro, Inc., 934 F.3d 497 (3d Cir. 1991) (affirming lower court's determination that the timing of the plaintiff's discharge alone did not raise an inference of retaliation).  Timing, however, in connection with

other types of suggestive evidence, is clearly sufficient to demonstrate the causal link.  Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280-81 (3d Cir. 2000).  For example, the court of appeals held that timing combined with evidence of vague or inconsistent reasons given by an employer for an employee's termination was sufficient to satisfy the causation prong of the prima facie case.  Abramson, 260 F.3d at 289 ("Here, as we found in our discussion of the discrimination claim, [plaintiff] has succeeded in both casting doubt on the reasons [her employer] proffered for her termination, and in demonstrating that those reasons were vague and inconsistent."); Waddell v. Small Tube Products, Inc., 799 F.2d 69, 73 (3d Cir. 1986); see EEOC v. L.B. Foster Co., 123 F.3d 746, 753-54 (3d Cir.1997), cert. denied, 522 U.S. 1147 (1998).

Here, plaintiff alleges that officers retaliated against her by creating a hostile work environment.  Plaintiff has not alleged, however, specific dates for many of the examples of hostile conduct.  For example, plaintiff argues that some officers did not provide back-up because of the complaints she raised against other officers.  In support, plaintiff alleged "if I would report something to the chief or to a sergeant, it would blow up and I wouldn't receive any back-up whatsoever for a period of time . . . ."  (Pl.'s Ex. A at 45a.)  Plaintiff did not, however, assert specific dates of her complaints or of the episodes in which back-up was not provided.  When asked if the back-up situations happened within days of complaining about the derogatory comments made by Netzlof and Deringer, plaintiff answered "[n]ot long."  (Pl.'s Ex. C at 114a-16a.)  When asked what happened, plaintiff responded "I don't recall at this time," and she stated she could not recall any specifics about the episode.  (Id.)

Under these circumstances it would not be appropriate to conclude plaintiff adduced sufficient evidence to establish a clear causal connection between her protected activities and the adverse action based upon temporal proximity alone.  The temporal proximity of the protected

activities and the alleged retaliation for the most part was not specified, and thus timing alone would not establish the causal connection in this case. In order to establish the requisite causal nexus, plaintiff must, therefore, adduce probative evidence of ongoing antagonism or implausibilities in defendant's reasons for the adverse action. "[W]e have indicated that the passage of a long period of time between protected activity and an alleged retaliatory action weighs against a finding of a causal link where there is no evidence of retaliatory animus during the intervening period." Shaner v. Synthes, 204 F.3d 494, 505 (3d Cir. 2000) (citing Krouse, 126 F.3d at 503-04 ("Absent evidence of intervening antagonism or retaliatory animus, we conclude that the passage of time [between the filing of plaintiff's charge and the alleged retaliatory action] in this case is conclusive and that [plaintiff] failed to establish a causal link as a matter of law."); Woodson, 109 F.3d at 920-21).

Plaintiff alleges that ongoing antagonism existed because such back-up incidents repeatedly occurred after she made a complaint, and she was subjected to hostile treatment and harassment in the form of disrespectful comments, disparate treatment and mailbox and voice-mail tampering. The court agrees. Plaintiff adduced sufficient evidence of ongoing antagonism for a reasonable jury to find a casual connection between her protected activity and the adverse treatment. It is undisputed that plaintiff made numerous complaints and grievances both informal and formal throughout her tenure with New Kensington, including formal grievances in January 2003, August 2005, December 2005, and April 2006. During this time-frame and specifically from April 18, 2004 until the present, plaintiff presented evidence of ongoing harassment and hostile treatment including sexually offensive and threatening graffiti and tampering with her mailbox (i.e. a cut-out photo of knee pads was left in her mailbox on August 4, 2007), tampering with her voice-mail in 2004, derogatory treatment by male officers,

disparate treatment including changing shifts in 2006 without proper notice and denying training opportunities in 2005, remarks by her supervisor in 2005 that she would be fired if she became pregnant, and lack of back-up in 2007 making her job unreasonably dangerous. In light of all of the evidence, a reasonable fact-finder could conclude that the hostile work environment plaintiff was subjected to was in retaliation for engaging in protected activities. Plaintiff has therefore adduced sufficient evidence to establish a prima facie case.

### 4. Defendant's Legitimate Business Reason and Pretext

Once a plaintiff demonstrates a prima facie case of retaliation, the burden of production shifts under the <u>McDonnell Douglas</u> framework to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment decision. In this case, defendants have not articulated a legitimate business reason for their adverse retaliatory employment action – the hostile work environment. Under these circumstances the court need not consider pretext and defendants' motion for summary judgment must be denied with respect to plaintiff's Title VII retaliation claims.


### D. Pennsylvania Equal Rights Amendment Claim

The PERA provides that "[e]quality of rights under the law shall not be denied or abridged in the Commonwealth of Pennsylvania because of the sex of the individual." PA. CONST. art. I, § 28. Plaintiff sues defendants alleging they violated the PERA. Defendants argue that there is no private cause of action for damages for violation of the PERA or for the violation of the any Pennsylvania constitutional right. The court recognizes that defendants raised the same issue in their Rule 12 motion to dismiss, and the court denied the motion. The court took note of the decision of Court of Appeals for the Third Circuit in <u>Pfeiffer v. Marion</u>

Center Area School District, 917 F.2d 779 (3d Cir. 1990), which stated "a private right of action is available for cases of gender discrimination under the Pennsylvania Equal Rights Amendment." Id. at 789.

After this court ruled upon the motion to dismiss, Fay v. Muhlenberg College, No. 07-4516, 2008 WL 205227 (E.D. Pa. Jan. 24, 2008), was decided. In Fay, the district court noted the split in district court rulings within in the Third Circuit on the issue whether a private cause of action for damages exists under the PERA. Id. at *2-3. The court stated that the majority of the district courts directly follow Pfeiffer, but the minority treat the court of appeals' discussion of the PERA in Pfeiffer as dictum, noting Pfeiffer and the state court decisions cited in Pfeiffer were not employment discrimination cases. Id. at *3. The Fay decision analyzed the Pennsylvania constitutional provision, decisions, and relevant statutes and predicted that the Supreme Court of Pennsylvania will not the construe the PERA to afford a plaintiff a private cause of action for damages. In particular, the court observed that the statutory remedy provided by the PHRA for employment discrimination is the only cause of action against an employer under Pennsylvania law. Id. at *4 (citing Clay v. Advanced Computer Applications, Inc., 559 A.2d 917, 918 (Pa. 1989)).

The court will not address that issue here. For the reasons already set forth in this opinion, there is no evidence that plaintiff was treated differently than similarly situated male employees. Even assuming there is a private right of action under the PERA, the plaintiff did not set forth sufficient evidence to establish a genuine issue of material fact with respect to whether defendants treated plaintiff unequally because of her sex in violation of the PERA.[10]

---

[10] It is unclear what elements plaintiff must establish to recover damages for defendants' alleged violation of the PERA. Plaintiff did not cite case law or make any suggestion. Although the rights afforded to individuals under state law can reach beyond the rights afforded under federal law, plaintiff did not make a showing that the rights afforded under the PERA differ from those afforded by comparable federal law.

Summary judgment will be granted with respect to any gender-discrimination claim based upon the PERA.

To the extent plaintiff asserted a hostile work environment claim under the PERA, the court will deny defendants' summary judgment motion without prejudice. The parties did not brief the issue or cite case law, did not indicate the elements of the claim or address the evidence, or lack thereof, relevant to such a claim. The parties' failure to do so violated this court's case management order - summary judgment. (Docket No. 30.) That order provided, in relevant part:

> In the movant's brief, the movant shall, for each claim upon which summary judgment is sought, in the first paragraph in which the claim is analyzed, set forth the elements of the claim and identify by paragraph number the material facts not in dispute for that claim which support the movant's argument that the element has been or cannot be met. . . . In the opposing party's brief, the opposing party similarly shall, for each claim upon which summary judgment is sought, in the first paragraph in which the claim is analyzed, set forth the elements of the claim and identify by paragraph number the material facts in dispute for that claim which supports the opposing party's argument that summary judgment cannot be granted.

(Id. at 1-2.)

## VII. Conclusion

For the above stated reasons, defendants motion for summary judgment is granted in part and denied in part. With respect to plaintiff's disparate treatment and retaliation claims under Title VII and Section 1983 and the PERA, defendant's motion for summary judgment is granted. With respect to plaintiff's hostile work environment claims under Title VII, Section 1983 and, if applicable, the PERA, defendant's motion for summary judgment is denied.

By the court:

/s/ JOY FLOWERS CONTI
Joy Flowers Conti
United States District Judge

Dated: September 30, 2008